UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DENNIS H.,

                              Plaintiff,

         -against-                                    6:21-CV-0381 (LEK)

COMMISSIONER OF SOCIAL
SECURITY,

                              Defendant.

_____

<u>**MEMORANDUM-DECISION AND ORDER**</u>

**I.      INTRODUCTION**

Plaintiff Dennis H. commenced this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3),

seeking review of the decision of the Commissioner of Social Security ("Commissioner")

denying him Social Security Disability Insurance Benefits ("DIB") for lack of disability. Dkt.

No. 1 ("Complaint"). For the reasons set forth below, the Court denies Plaintiff's motion for

judgment on the pleadings, Dkt. No. 13 ("Plaintiff's Brief"), grants the Commissioner's motion

for judgment on the pleadings, Dkt. No. 16 ("Commissioner's Brief"), and affirms the final

decision of the Commissioner.

**II.     BACKGROUND**

**A. Factual Background**

In January 2011, Plaintiff suffered an injury "at the group home" where he "was

working" as a Direct Support Assistant ("DSA") for the Central New York Developmental

Disabilities Services Office ("DDSO"). Dkt. No. 10 ("Transcript") at 108, 338.[1] Plaintiff "was

_____

[1] For the avoidance of doubt, the Court uses the large, bolded numbers that appear in the bottom
righthand corner of the Administrative Record when referring to specific pages therein.

taking some groceries downstairs [to the basement] and was about 4–5 steps from the bottom when his foot gave out on him causing him to fall." Id. at 733. As he fell, Plaintiff "struck his dominant right elbow on the railing and then landed on the edge of a step with his lower back and then struck his right elbow again on the steps." Id.

After his injury, Plaintiff did not return to work at the DDSO, id. at 745, and sought an evaluation of his "low back, right elbow pain" from Stephen Wade, M.D., an orthopedic surgeon at Advanced Physical Medicine and Rehabilitation ("APMR") in Utica, New York, id. at 490. Dr. Wade noted that Plaintiff's muscle strength was "4/5" across the board. Id. at 491. He also observed that Plaintiff "ambulate[d] with an antalgic gait." Id. Plaintiff then started pain medication, id. at 492, which helped but did not fully alleviate his pain, id. at 493. In addition to visiting Dr. Wade at APMR to treat Plaintiff's injury, see, e.g., id. at 493, 496, 499, 502, Plaintiff "started seeing [John] Syrotynsky, [D.C.,] a chiropractor," on May 20, 2011, id. at 736.

The following year, on January 4, 2012, Plaintiff was officially terminated from his job at the DDSO. Id. at 35, 338. Shortly after his termination, Plaintiff visited Arlen K. Snyder, M.D., who conducted an independent medical examination of Plaintiff's injuries for the State of New York's Workers' Compensation Board. Id. at 733. In the accompanying report, Dr. Snyder noted that he reviewed "X-rays of [Plaintiff's] back and right elbow" and found them to be "normal except for mild narrowing of the [lumbosacral joint] disc space." Id. at 734. Dr. Snyder determined that Plaintiff had "a mild/moderate level of disability as far as his lower back is concerned and mild relative to his right upper extremity." Id. at 741. Dr. Snyder therefore concluded that Plaintiff should not engage in "constant repetitive flexion and extension activities with his back and . . . not have to lift more than 15–20 pounds." Id. at 742. With respect to Plaintiff's work capabilities, Dr. Snyder also opined that Plaintiff had the following limitations,

among others: (a) sitting for a maximum of three to four hours at a time; (b) standing and walking for two to three hours at a time; (c) sitting, standing, or walking in combination for a total of eight hours in a given day; (d) "chang[ing] posture as needed"; (e) frequently lifting and carrying no more than ten pounds; (f) never lifting or carrying twenty-one pounds or more; (g) only occasionally bending, squatting, reaching above shoulder level, and operating a motor vehicle; and (h) never crawling, climbing, or running. Id. at 743.

Later that year, on July 30, 2012, Patrick Connolly, M.D., performed another independent medical examination of Plaintiff for the Workers' Compensation Board. Id. at 744. Dr. Connolly observed that Plaintiff was "emotionally stressed, and . . . demonstrate[d] signs of symptom magnification." Id. at 746. He added that Plaintiff was "able to ambulate without assistive devices," and was "capable of going from sitting to standing, standing to sitting, and sitting to lying down." Id. Dr. Connolly also observed Plaintiff had "normal strength," "no evidence of muscle atrophy," full range of motion in his cervical spine, and "full extension of the lumbar spine," with "forward flexion . . . of 30 degrees." Id.

Nearly two years later, in April 2014, Dr. Connolly performed his second independent evaluation of Plaintiff for the Workers' Compensation Board. Id. at 748. Dr. Connolly again observed that Plaintiff was able to ambulate "without assistive devices," and could alternate between sitting, standing, and lying down without difficulty. Id. Dr. Connolly further noted that Plaintiff had "full movement of the cervical spine and full movement of both shoulders," as well as "full extension of the lumbar spine," with "forward flexion to 40 degrees." Id. "No muscle atrophy [was] noted," nor any "evidence of carpal tunnel or cubital tunnel syndrome" on Plaintiff's left and right sides. Id.

A year and a half after Dr. Connolly's second evaluation, Plaintiff filed his present application for DIB on October 15, 2015, alleging disability due to "[l]umbar [d]isc [d]isplacement," "[m]yofascitis," and "[p]ain in limbs." Id. at 293, 337. In the application, Plaintiff alleged that he "became unable to work" on July 4, 2012, id. at 294, 333, the same year in which the DDSO terminated Plaintiff's employment as a DSA, id. at 35, 338.

While Plaintiff's application was pending, the Division of Disability Determination then referred Plaintiff to Brian Cole, M.D., for a consultative examination. Id. at 539. In his report, dated December 4, 2015, Dr. Cole observed that Plaintiff did not "appear[] to be in [any] acute distress," and that his "[g]ait" and "stance" were both "normal." Id. at 540. Dr. Cole also noted that Plaintiff could fully squat, albeit "slowly," and that Plaintiff could not "walk on heels and toes without difficulty and balance issues." Id. Plaintiff also had a full range of motion in his cervical spine, with some lower back pain when Plaintiff extended his lumbar spine. Id. In his medical source statement, Dr. Cole concluded that Plaintiff "has mild restrictions for squatting and kneeling," and "moderate restrictions for heavy lifting and carrying." Id. at 542.

The following month, Plaintiff returned to APMR for the first time since 2013 to see Dr. Wade, upon the recommendation of Plaintiff's chiropractor. Id. at 675. Shortly thereafter, Plaintiff's claim for DIB before the Social Security Administration was initially denied on February 4, 2016. Id. at 145. Plaintiff then "filed a written request for a hearing [before an Administrative Law Judge ('ALJ')] on March 29, 2016." Id. (citation omitted). Plaintiff was ultimately granted a hearing, but it would not take place for another two years. In the interim, Plaintiff continued to visit APMR for treatment, where Plaintiff began to see Ned G. Urbiztondo, M.D., in September 2016, id. at 653, and Nameer Haider, M.D., in February 2017, id. at 629. APMR's records from this time noted that Plaintiff was a former patient of Dr. Wade. Id. at 653.

4

Then, in November 2017, Plaintiff began to see Sascha Qian, M.D., at APMR. Id. at 593. At this visit, Plaintiff reported that a previous epidural injection did not significantly relieve his back pain. Id. The results of Dr. Qian's physical examination were largely similar to those of past examinations conducted by other doctors at APMR: no less than "4/5" "muscle strength," some lower back "tenderness," and some decreased "sensation." Id. at 595–96. However, Dr. Qian also noted that "[f]lexion is painful," and only extended to "30 degrees." Id. at 595.

On December 13, 2017, Plaintiff presented again to Dr. Qian for a follow-up appointment regarding "an acute flare up of his underlying chronic low back pain." Id. at 588. Plaintiff reported that his "pain level" was "7/10," and described it "as a constant sharp[,] achy pain that is aggravated by walking, standing, [and] bending." Id. Dr. Qian observed that Plaintiff's radiculopathy had "slightly worsened since [the] last exam." Id. at 588. Therefore, Dr. Qian approved Plaintiff "[f]or treatment of an acute flare up of bilateral lumbosacral radiculopathy due to dynamic foraminal spinal stenosis exacerbated by motion and weight bearing . . . ." Id. at 592. Then, on January 31, 2018, Dr. Qian wrote a medical report in the form of a letter, stating that Plaintiff had "significant pain and partial disability from lumbar radiculopathy," and that "this has been confirmed with objective testing." Id. at 725. Dr. Qian added that Plaintiff would "have hours or days of acute pain flares, which may significantly affect his function." Id.

On March 7, 2018, Dr. Qian completed a medical source statement for the Social Security Administration, noting that Plaintiff had been treated "[m]onthly since initial consult [on] 5/2/11." Id. at 761.[2] In this medical source statement, Dr. Qian reported that Plaintiff was diagnosed with "[l]umbrosacral radiculopathy." Id. at 761. Plaintiff's symptoms included "[l]ow

---

[2] Dr. Qian was likely referring to Plaintiff's treatment relationship to APMR more generally, and not to Dr. Qian individually, since the earliest record of Dr. Qian's treatment notes regarding Plaintiff are from November 2017. Tr. at 593.

back pain with radiation into both legs associated with weakness [and] numbness." Id. Dr. Qian also observed that Plaintiff was unable to walk on heels or toes. Id. Dr. Qian further noted that Plaintiff's spinal problems have resulted in "low back pain partially secondary to arthritis, which limits endurance for sitting and standing." Id. at 762.

With respect to Plaintiff's physical limitations, Dr. Qian opined that Plaintiff could sit for only twenty minutes before needing to stand up, and vice versa. Id. at 762–63. Dr. Qian also attested that Plaintiff could only "sit and stand/walk" for about 2 hours total each in an eight-hour workday, among several other physical limitations. Id. at 763. Dr. Qian also estimated that Plaintiff would "need to take unscheduled breaks during an 8-hour workday[,]" at least "4 times a day," for about "15 minutes" each. Id. at 764. Therefore, Dr. Qian concluded that Plaintiff would likely be "off task," i.e., unable to maintain attention nor perform at a consistent pace, for more than twenty percent of the workday, and would be absent from work "[m]ore than four days per month." Id. Finally, Dr. Qian noted that Plaintiff had experienced these limitations since at least July 4, 2012, the alleged onset date of his disability. Id. at 765.

A week later, Plaintiff testified at a hearing before ALJ Bruce S. Fein. At this hearing, a representative for Plaintiff "stated that the alleged onset date [of disability] should have been January 4, 2011, the date [Plaintiff] was injured, because he had not worked since that date . . . ." Id. at 145. However, Plaintiff "did not request that the alleged onset date be amended" because, even "[h]ad the request been made, no change in the past due benefits . . . would have resulted since the application was not filed until October of 2015, and benefits could have only been paid for the period beginning 15 months before the date of filing." Id. "After the hearing . . . new medical evidence was provided by [Plaintiff's] representative," id., including Dr. Qian's treatment notes. After reviewing the new evidence, ALJ Fein "determined that a medical

interrogatory should be sent and[,] on April 4, 2018, submitted one to Justin Willer, M.D. . . . ." Id.

In the meantime, Plaintiff returned to Dr. Qian on April 25, 2018, for a post-procedure follow-up concerning "a Right L4-S1 Transforaminal Epidural steroid injection done on [March 26, 2018]." Id. at 931. Plaintiff "reported that pain relief lasted for about 2 weeks before starting to return." Id. Dr. Qian and Plaintiff "[d]iscussed [a] possible spinal cord stimulator for treatment of [Plaintiff's] low back pain." Id. at 935. Plaintiff said he "would like to review this with his other providers . . . and reconsider this option at a later date." Id.

Then, on May 7, 2018, Dr. Willer filed his response to the medical interrogatory. Id. at 145. In his response, Dr. Willer recognized Plaintiff's impairments as "low back pain" and "lumbosacral radiculopathy," but opined that the objective evidence did not establish any physical limitations. Id. at 835–44. ALJ Fein afforded Plaintiff an opportunity to respond, but no response was received before the deadline to submit one expired. Id.

On July 12, 2018, ALJ Fein issued a decision finding that Plaintiff "was not disabled under sections 216(i) and 223(d) of the Social Security Act through March 31, 2017, the last date insured." Id. at 155. Specifically, ALJ Fein found that, through that date, Plaintiff "was capable of performing past relevant work as a cashier, gaming attendant, hospital patient registration, and aide for developmentally disabled patients." Id. at 154. "This work did not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity [('RFC')]." Id. (citation omitted). In the decision, ALJ Fein gave (1) "great evidentiary weight to the opinion of Dr. Willer," which found no physical limitations, id. at 149; (2) "[l]ittle weight" to the assessments made by Dr. Snyder and Dr. Connolly because their assessments were "made for worker's compensation purposes," and not the Social Security Administration, id. at 153; (3)

"[s]ome weight" to Dr. Cole's "assessment because it was based on a physical examination" but "the assessment was vague," id.; and (4) "little evidentiary weight" to Dr. Qian's assessment "because it was based on testing found invalid by Dr. Willer," "a recognized medical expert neurologist," id. at 154.

Shortly after receiving the decision, Plaintiff asked the Appeals Council of the Social Security Administration ("Appeals Council") to review ALJ Fein's decision. On October 25, 2019, the Appeals Council vacated the hearing decision and remanded the case to another ALJ. Id. at 161, 163. Upon administrative remand, the ALJ was instructed, among other things, to:

- Obtain additional evidence concerning [Plaintiff's] impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512). The additional evidence may include, if warranted and available, consultative examinations and medical source opinions about what [Plaintiff] can still do despite the impairment.

- Give further consideration to [Plaintiff's] maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the treating and nontreating source opinions pursuant to the provisions of 20 CFR 404.1527 and nonexamining source opinions in accordance with the provisions of 20 CFR 404.1527, and explain the weight given to such opinion evidence . . . .

Id. at 164–65.

The following year, on March 9, 2020, Plaintiff appeared in person before a different ALJ—Jeremy Eldred—for a new hearing. Id. at 95. At the hearing, a representative for Plaintiff provided new evidence, including medical records from APMR through January 15, 2020. Id. at 15, 861–958. Over the course of the hearing, Plaintiff not only testified to the pain he has suffered since his 2011 work injury, see, e.g., id. at 108–14, 117, but he also spoke to his work

experiences since the injury, which included a part-time job at a convenience and gaming store from May 25, 2016, until February 18, 2019, id. at 105–06, as well as a second job as a clerical worker at a hospital from August 25, 2017, until August 14, 2019, id. at 103. Plaintiff also testified that he spent "anywhere between 20 and 30" hours a week doing online college courses. Id. at 116.

After Plaintiff finished testifying, Dennis J. King, an impartial vocational expert ("VE"), appeared and testified by telephone. Id. at 15, 128. VE King testified that if an individual were "off-task" ten percent or more at a workplace for unskilled jobs, all work would be precluded. Id. at 129. VE King further opined that if an individual were to be consistently absent more than once a month, all nonskilled work would be precluded as well. Id. at 130.

**B.  The ALJ's March 30, 2020, Decision**

On April 2, 2020, ALJ Eldred determined that Plaintiff "is not disabled under sections 216(i) and 223(d) of the Social Security Act." Tr. at 22. ALJ Eldred reached this conclusion by proceeding through the five-step sequential evaluation process for evaluating disability under the Social Security Act. Id. at 16 (citing 20 C.F.R. § 404.1520(a)).

At step one, ALJ Eldred determined that "[t]here is no evidence of substantial gainful activity from the alleged onset date until May 25, 2016, and no evidence of substantial gainful activity since August 14, 2019." Tr. at 18. At step two, ALJ Eldred found that Plaintiff "has the following 'severe' impairments: degenerative disc disease of the lumbosacral spine with lumbosacral radiculopathy." Id. at 18 (citing 20 C.F.R. § 404.1520(c)). At step three, ALJ Eldred determined that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. at 18 (citing 20 C.F.R. §§ 404.1520(d), 1525, 1526).

At step four, ALJ Eldred found that Plaintiff "has the residual functional capacity to perform the full range of sedentary work, as defined in 20 CFR 404.1567(a)." Tr. at 18. In support of this finding, ALJ Eldred noted that even though Plaintiff's "medically determinable impairments could reasonably be expected to cause his alleged symptoms," his "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." Id. at 20. ALJ Eldred specifically noted that Plaintiff "performed substantial gainful activity . . . for a period of over three years" after the alleged onset date of his disability. Id. ALJ Eldred also determined that "[t]he information in [Plaintiff's] Function Report supports a sedentary residual functional capacity, as do the comments about [Plaintiff's] daily activities," which include taking online college classes, making his own meals, cleaning his home, and so on. Id.

With respect to the medical opinion evidence, ALJ Eldred afforded the opinion of Dr. Cole, the consultative examining physician, "some weight." Id. As for the opinion of Dr. Willer, which ALJ Fein had previously afforded "great evidentiary weight," ALJ Eldred only gave it "limited weight," because he viewed the "opinion [as] overly optimistic, given all the [other] evidence in the record" showing at least *some* physical limitations. Id. at 20–21. As for the opinions of the independent medical examiners who saw Plaintiff for workers' compensation purposes, ALJ Eldred afforded Dr. Connolly's opinion "significant weight," but Dr. Snyder's "relatively little weight . . . ." Id. at 21. ALJ Eldred gave more weight to Dr. Connolly's opinion, which stated that Plaintiff was "capable of full-time sedentary employment" between July 2012 and April 2014, because "[h]e is an orthopedic specialist who examined the claimant more than once, and his reports show that he reviewed other medical records, as well as various diagnostic images and studies, in reaching his opinion." Id. (citation omitted). ALJ Eldred discounted Dr.

Snyder's opinion only because it was "issued several months before [Plaintiff's] alleged onset date of disability." Id. However, ALJ Eldred noted that affording Dr. Snyder's opinion "little weight" was of little consequence, since it was "not inconsistent with the ability to do a range of light and sedentary work." Id.

Finally, ALJ Eldred gave the "[o]pinions regarding [Plaintiff's] physical limitations from . . . [Dr.] Qian . . . little weight." Id. (citation omitted). This was because:

> Dr. Qian's conclusion that [Plaintiff] has disabling physical limitations is inconsistent with the fact that the claimant was engaged in a prolonged period of substantial gainful activity when Dr. Qian offered [the] opinions. Moreover, although the record indicates that Dr. Qian examined the claimant on a few occasions in the past, Dr. Qian's treatment relationship with the claimant is not so frequent and extensive that [Dr. Qian's] opinion would be entitled to significantly greater weight than Dr. Connolly's opinion.

Id. (citation omitted).

Because Plaintiff "had no history of sedentary work prior to his alleged onset date of disability," ALJ Eldred then proceeded to step five of the analysis and found that "based on a residual functional capacity for the full range of sedentary work, and considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by medical-vocational rules 201.28 and 201.21." Id. at 22. Accordingly, ALJ Eldred determined that Plaintiff "has not been under a disability . . . from July 4, 2012[,] through the date of this decision." Id. (citing 20 C.F.R. § 404.1520(g)). On February 2, 2021, the Appeals Council denied further review of ALJ Eldred's decision denying DIB to Plaintiff, thereby making the unfavorable decision the final decision of the Commissioner. Id. at 1.

## C.  The Present Action

Plaintiff commenced suit in this Court on April 3, 2021, to challenge the denial. Compl. ¶¶ 1–2. In his opening brief, Plaintiff argues that "[t]he ALJ's RFC determination is unsupported

by substantial evidence as he failed to properly weigh the opinion of treating physical Sascha Qian, M.D." Pl.'s Br. at 1. Specifically, Plaintiff argues that "the ALJ completely failed to weigh Dr. Qian's opinion in accordance with factors" required under the treating physician rule.[3] Id. at 13. For instance, "[t]he ALJ failed to consider how Dr. Qian's opinion was supported by [Dr. Qian's own] treatment notes," id., none of which "were cited by the ALJ in his discussion," id. at 14. Plaintiff also argues that ALJ Eldred "failed to consider other evidence of the record that supports Dr. Qian's opinion," including Dr. Wade's treatment notes from 2016; MRIs from 2016, 2017, and 2019; and treatment notes from a nurse practitioner in early 2020. Id. at 14–15.

Plaintiff also posits that ALJ Eldred "mischaracteriz[ed]" evidence in the record when he stated that "Dr. Qian's treatment relationship with [Plaintiff] is not so frequent and extensive that [Dr. Qian's] opinion would be entitled to significantly gr[e]ater weight than Dr. Connolly's opinion." Id. at 16 (citing Tr. at 21). Plaintiff points out that "Dr. Qian . . . treated Plaintiff monthly since initial consult in May 2011," Pl.'s Br. at 16 (citing Tr. at 761), whereas "Dr. Connolly . . . only examined the Plaintiff twice," Pl.'s Br. at 16 (citing Tr. at 745, 748). The remainder of Plaintiff's brief seeks to explain why "Plaintiff would be found disabled" "if the opinion of Dr. Qian [had been] properly weighed," because Dr. Qian found that Plaintiff could perform less than sedentary work. Pl.'s Br. at 17.

In response, the Commissioner argues that ALJ Eldred "properly weighed the treating physician opinion before assessing a sedentary residual functional capacity" in compliance with the old treating physician rule. Comm'r's Br. at 1. Notably, Dr. Qian, "the treating source[,] met with Plaintiff only four times prior to [issuing the] opinion[]" regarding Plaintiff's physical

---

[3] Since Plaintiff filed his application for DIB before new regulations regarding medical opinion evidence took effect on March 27, 2017, the Court applies the older treating physician rule to evaluate whether the ALJ erred. See C.F.R. § 404.1520(c).

limitations, id., and only "five times" total from "November 2017 through April 2018," id. at 11. Moreover, "Plaintiff was performing substantial gainful activity and attending school [online] at the time of the opinion." Id. at 1. In the alternative, the Commissioner posits that even if the ALJ erred in discounting Dr. Qian's opinion, Plaintiff has failed to show how affording Dr. Qian's opinion more weight would have "establish[ed] a more restrictive RFC," which is Plaintiff's burden to bear. Id. at 13 (citation omitted).

## III.   LEGAL STANDARD

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Brault v. Soc. Sec. Admin. Comm'r, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). "'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "Whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). If supported by substantial evidence, the Commissioner's findings "will be sustained . . . even where substantial evidence may support the plaintiff's position and despite [the fact] that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988).

Although an ALJ is not required to explicitly analyze every piece of conflicting evidence in the record, see Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), the ALJ cannot "pick and choose evidence in the record that supports his conclusions," Cruz v. Barnhart, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004).

When claiming error, a plaintiff bears the burden of showing he was harmed by it. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking [an] agency's determination."). However, "[t]o say that the claimant has the 'burden' of showing that an error was harmful is not to impose a complex system of 'burden shifting' rules or a particularly onerous requirement." Id. at 410. The Second Circuit has not definitively ruled on the required showing to warrant a remand. But some district courts within the Second Circuit have found that the "mere probability" or "possibility" of prejudice to a Social Security claimant is enough to warrant remand to the Commissioner. See, e.g., Koutrakos v. Astrue, 906 F. Supp. 2d 30, 39 (D. Conn. 2012); Torres v. Colvin, No. 13-CV-1914, 2015 WL 13729869, at *6 (D. Conn. Dec. 2, 2015), rep. and rec. adopted, 2016 WL 1182978 (D. Conn. Mar. 28, 2016).

## IV.   DISCUSSION

Plaintiff's argument for remand relies exclusively upon his theory that ALJ Eldred "failed to properly weigh the opinion of treating physician Sascha Qian, M.D." Pl.'s Br. at 11. Crucial to that theory is Plaintiff's claim that ALJ Eldred "completely failed to weigh Dr. Qian's opinion in accordance with factors" required under the old treating physician rule, which applies to claims for DIB filed before March 27, 2017. See C.F.R. § 404.1520(c).

When applying the old treating physician rule, 20 C.F.R. § 404.1527, there are "specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating

physician's opinion." <u>Estrella v. Berryhill</u>, 925 F.3d 90, 95 (2d Cir. 2019). "First, the ALJ must

decide whether the opinion is entitled to controlling weight." <u>Id.</u> at 95.

> The opinion of a claimant's treating physician as to the nature and
> severity of the impairment is given controlling weight so long as it
> is well supported by medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent with (or contradicted
> by) other substantial evidence in the claimant's case record.

<u>Schillo v. Kijakazi</u>, 31 F.4th 64, 75 (2d Cir. 2022) (citing <u>Burgess v. Astrue</u>, 537 F.3d 117, 128

(2d Cir. 2008), and 20 C.F.R. § 404.1527(c)(2)). "Second, if the ALJ decides the opinion is not

entitled to controlling weight, it must determine how much weight, if any, to give it." <u>Estrella</u>,

925 F.3d at 95. The governing regulations require an ALJ to explicitly consider certain

nonexclusive factors when making this determination: "(1) the frequency, length, nature, and

extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the

consistency of the opinion with the remaining medical evidence; and (4) whether the physician is

a specialist." <u>Id.</u>–95–96 (alterations and internal quotation marks omitted) (summarizing 20

C.F.R. § 404.1527(c)). "Even though this list of considerations is established by regulation," the

Second Circuit "discussed them at length in <u>Burgess v. Astrue</u>, 537 F.3d at 129, and so they are

sometimes referred to as the '<u>Burgess</u> factors.'" <u>Schillo</u>, 31 F.4th at 75.

"At both steps, the regulations require the ALJ to give 'good reasons'—i.e., reasons

supported by substantial evidence in the record—for the weight she affords the treating source's

medical opinion." <u>Id.</u> (citations omitted). Indeed, the Second Circuit remanded in <u>Colgan v.</u>

<u>Kijakazi</u>, where the ALJ failed to provide good reasons at step one for discounting a treating

physician's opinion. 22 F.4th 353, 360 (2d Cir. 2022). In that case, the ALJ improperly relied on

a "one-time snapshot" of the claimant's mental health status to find that the treating physician's

opinion was inconsistent with the objective medical evidence. <u>Id.</u> at 362.

"If the ALJ proceeds to step two, she must explicitly apply the factors listed in [20 C.F.R.] § 404.1527; the failure to do so is procedural error and subject to harmless error analysis." Schillo, 31 F.4th at 75 (citations omitted). "A court can conclude that such an error is harmless if the ALJ has otherwise provided 'good reasons' for its weight assignment." Id. (citing Estrella, 925 F.3d at 96). "For instance, [the Second Circuit has] upheld an ALJ's denial of disability benefits even where the ALJ's written opinion failed to assist [the Second Circuit's] review on appeal and did not 'generate much confidence in the result.'" Schillo, 31 F.4th at 75 (quoting Halloran v. Barnhart, 362 F.3d 28, 31–33 (2d Cir. 2004)). In Halloran, it was "unclear on the face of the ALJ's opinion whether the ALJ considered (or even was aware of) the applicability of the treating physician rule," but the Second Circuit concluded, "[a]fter carefully considering the entire record and the ALJ's opinion," that the ALJ had applied the substance of the rule. 362 F.3d at 32. There, the ALJ explained in detail how the treating physician's two key findings were "uninformative" and "conclusory," and noted that the treating physician failed to "address the question of whether [the claimant] could [perform previous job duties] if given several breaks or allowed to change position often." Id. (internal quotation marks omitted).

Here, at step one, ALJ Eldred decided not to afford controlling weight to "Dr. Qian's conclusion that [Plaintiff] has disabling physical limitations." Tr. at 21 (only affording the opinion "little weight"); see also Schillo, 31 F.4th at 76 n.3 ("Although the ALJ . . . did not expressly state she would not afford 'controlling' weight to the opinions of [the plaintiff's] treating physicians, that much is clear given that the ALJ ultimately concluded that [they] would receive little and partial weight . . . ."). The Court finds that the reason ALJ Eldred provided— that Dr. Qian's opinion was "inconsistent" with Plaintiff's "prolonged period of substantial gainful activity," Tr. at 21—was a "good reason" supported by substantial evidence.

By pointing to the fact that Plaintiff "was engaged in a prolonged period of substantial gainful activity when Dr. Qian" opined that Plaintiff had disabling physical limitations, Tr. at 21, ALJ Eldred highlighted an obvious inconsistency between Dr. Qian's opinion and other record evidence. See Schillo, 31 F.4th at 75 ("The opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with (or contradicted by) other substantial evidence in the claimant's case record."). The Court finds that this clear inconsistency constitutes a good reason for not affording Dr. Qian's less-than-sedentary opinion controlling weight. See Stanton v. Astrue, No. 07-CV-0803, 2009 WL 1940539, at *6 (N.D.N.Y. July 6, 2009) (Kahn, J.) (adopting a magistrate judge's finding that an ALJ's decision to discount a treating source's opinion "was supported by substantial evidence[]" because the plaintiff's "actual performance of substantial gainful activity" at a given time "contradicted" the treating source's opinion that the plaintiff was unable "to perform substantial gainful activity" during the same period), aff'd, 370 Fed. App'x 231 (2d Cir. 2010). Elsewhere in his decision, ALJ Eldred pointed to other record evidence that similarly contradicted Dr. Qian's conclusion that Plaintiff had disabling physical conditions that precluded even sedentary work. For example, around the time Dr. Qian issued his medical source statement opining that Plaintiff could only sit for about two hours total in an eight-hour workday, Tr. at 763, Plaintiff "testified that he has continued to take online college classes, and he spends 20 to 30 hours per week doing so," id. at 20, which necessarily averages to spending more than two hours per day completing online college coursework.

Of course, Plaintiff is correct that many of Dr. Qian's treatment notes are still perfectly consistent with much of the record, see Pl.'s Br. at 14–16, such as the notes from Plaintiff's

17

November 2017 APMR visit, where Dr. Qian observed that Plaintiff had no less than "4/5" "muscle strength," some lower back "tenderness," and some decreased "sensation." Tr. at 595–96. But ALJ Eldred did not discredit those observations in his opinion denying Plaintiff DIB. See id. at 15–22. ALJ Eldred only discounted Dr. Qian's specific opinion that Plaintiff was incapable of performing the full range of sedentary work because of the opinion's lack of consistency with other record evidence. Id. at 21. Notably, this "kind[] of finding[]"—i.e., "the . . . finding of whether a claimant is disabled and cannot work"—is "'reserved to the Commissioner.'" Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1527(e)(1)). In other words, while the Commissioner must "consider[] the data that physicians provide," it still "draws its own conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." Id.

Given that ALJ Eldred's decision not to afford controlling weight to Dr. Qian's less-than-sedentary opinion was supported by substantial evidence, the Court next turns to Plaintiff's argument that ALJ Eldred committed an error of law by failing to follow the correct procedures when applying the treating physician rule. Pl.'s Br. at 13. As the Second Circuit recognized in Schillo, "[o]nce [an] ALJ decide[s] not to afford controlling weight to [a] treating physician[']s[] opinion[]," the ALJ is "required to explicitly review the factors listed in 20 C.F.R. § 404.1527(c) to determine what (if any) lesser weight to give th[at] opinion." 31 F.4th at 78 (citing Burgess, 537 F.3d at 129). Here, it is undisputed that ALJ Eldred failed to consider each factor explicitly when determining that Dr. Qian's opinion was only entitled to "little weight" and thereby committed a procedural error. See Tr. at 21.

"But this is not the end of the road." Schillo, 31 F.4th at 78. After a thorough examination of the record, the Court still finds that ALJ Eldred "nevertheless applied the substance of the

18

treating physician rule." Id. at 79. That is because ALJ Eldred's "written decision effectively

covered the [Burgess] factors . . . including the nature of the examining and treating

relationship[], the supportability of the opinion[], [its] consistency with the record as a whole,

and the doctor[']s[] specialization." Id.

    With regard to the treating relationship, ALJ Eldred expressly noted that "Dr. Qian [only]

examined [Plaintiff] on a few occasions in the past," in determining that Dr. Qian's opinion

regarding Plaintiff's physical limitations was entitled to "little weight." Tr. at 21. Plaintiff's

related argument that this finding amounts to a "mischaracterization" of the evidence is without

merit. Pl.'s Br. at 16 (citing Tr. at 21). As the Commissioner correctly points out, Dr. Qian "met

with Plaintiff only four times prior to" issuing the medical source statement. Comm'r's Br. at 1.

In this period of less than a year, it is unlikely that Dr. Qian was able to develop "a detailed,

longitudinal picture of [Plaintiff's] medical impairment[s]" as envisioned by the treating

physician rule. 20 C.F.R. § 404.1527(c)(2); cf. Barrett v. Berryhill, 286 F. Supp. 3d 402, 427

(E.D.N.Y. 2018) (finding that "over a four-year period" a treating source was "able to 'develop a

longitudinal picture' of [p]laintiff's medical history and impairments'"); Price v. Comm'r of Soc.

Sec., No. 19-CV-8499, 2021 WL 1222139, at *3 (S.D.N.Y. Mar. 31, 2021) (finding that "[o]ver

the course of a four-year treatment relationship," a plaintiff's treating source "likely gained a

'longitudinal picture' of [the plaintiff's] impairments" (quoting 20 C.F.R. §§ 404.1527(c)(2)(i))).

    That Plaintiff was treated at the same pain clinic for many years does not change the fact

that Dr. Qian only treated Plaintiff a total of five times during a discrete period from November

2017 through April 2018. Tr. at 588, 593, 931, 937, 942. Nor is this fact contradicted by Dr.

Qian's statement that Plaintiff had been treated "[m]onthly since initial consult [on] 5/2/11." Id.

at 761. A review of the record suggests that Dr. Qian was referring to Plaintiff's treatment at the

APMR clinic more broadly, which began with Dr. Wade in 2011. See id. at 490. Plaintiff has not

pointed to any records of Dr. Qian treating Plaintiff prior to November 2017. Cf. id. at 588, 593,

931, 937, 942. Nor has Plaintiff provided the Court with any authority suggesting that the

relevant inquiry into a treating source's relationship with a given patient should proceed not in

reference to a specific treating individual but rather to the larger medical practice to which that

individual belongs. See Pl.'s Br. at 16.

Nonetheless, Plaintiff still claims that the substance of the treating physician rule was

traversed because "[t]he ALJ failed to consider how Dr. Qian's opinion was supported by [Dr.

Qian's own] treatment notes," id. at 13, and other evidence of the record, including Dr. Wade's

treatment notes from 2016; MRIs from 2016, 2017, and 2019; and treatment notes from a nurse

practitioner in early 2020, id. at 14–15. See Burgess, 537 F.3d at 129 (requiring an examination

into "the 'relevant evidence . . . particularly medical signs and laboratory findings,' supporting

the opinion" (quoting 20 C.F.R. § 404.1527(c)(3))). Plaintiff then states, in a conclusory fashion,

that "[t]his probative evidence" of Plaintiff's medically determinable impairments and symptoms

"is consistent with and supportive of Dr. Qian's opinion." Pl.'s Br. at 15; see also Burgess, 537

F.3d at 129 (also requiring an examination into "the consistency of the opinion with the record as

a whole").

But Plaintiff has not demonstrated how any of the treatment or medical records ALJ

Eldred failed to account for explicitly in his analysis were consistent with, or would have further

supported, Dr. Qian's less-than-sedentary opinion. As noted earlier, ALJ Eldred only discounted

Dr. Qian's specific opinion that Plaintiff was incapable of performing the full range of sedentary

work. Tr. at 21. Nowhere in his decision does ALJ Eldred reject Dr. Qian's general treatment

observations, which are largely supported by other evidence in the record; ALJ Eldred only

explicitly discounted Dr. Qian's opinion that Plaintiff did not maintain the ability to perform even sedentary work. See id. at 15–22. That is because every other medical opinion in the record showed that Plaintiff, at the very least, maintained the ability to perform sedentary work. See id. at 20–21. Dr. Qian's finding that Plaintiff did not maintain this ability is an outlier, and is not supported by any other evidence in the record.

Plaintiff does not advance any specific arguments regarding the ALJ's failure to explicitly consider Dr. Qian's specialization, see Burgess, 537 F.3d at 129 (requiring an examination into "whether the [treating] physician is a specialist"), but it appears that the ALJ implicitly acknowledged that Dr. Qian was not "an orthopedic specialist" in choosing to afford Dr. Connolly's opinion greater weight. Tr. at 21. The Court gleans this from the fact that ALJ Eldred specified Dr. Connolly's specialty—orthopedics—and omitted this specialty in his discussion of Dr. Qian's opinions. See id.; see also Schillo, 31 F.4th at 79 n.6 ("glean[ing]" one doctor's lack of specialty "from the fact that the ALJ . . . omitted a specialty in her discussion of [that doctor's] opinions[]" but "specified [another doctor's] specialty" in neurology while weighing the medical opinions). Further, the record makes clear that Dr. Qian is a physician "trained in pain medicine" and "anesthesiology," not orthopedics. See, e.g., Tr. at 725.

Accordingly, even though ALJ Eldred "should have proceeded more methodically through the factors enumerated in [20 C.F.R.] § 404.1527(c)(2), it is evident that he 'applied the substance of the treating physician rule.'" Schillo, 31 F.4th at 79 (quoting Halloran, 362 F.3d at 32). When ALJ Eldred explained why he was affording Dr. Qian's conclusion regarding Plaintiff's "physical limitations . . . little weight," id. at 21, he did so by providing good reasons—namely, other evidence in the record that contradicted Dr. Qian's opinion, the limited nature of Plaintiff's treatment relationship with Dr. Qian, and Dr. Qian's lack of specialty in

orthopedics. Therefore, even though Plaintiff is correct that ALJ Eldred failed to discuss on the record each of the factors mandated by 20 C.F.R. § 404.1527(c), such a failure is harmless. See Schillo, 31 F.4th at 79.

Accordingly, ALJ Eldred properly weighed the opinion evidence and medical evidence in the record in reaching his RFC determination. As such, the RFC determination is supported by substantial evidence, and Plaintiff is not entitled to remand on this ground.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Plaintiff's motion for judgment on the pleadings (Dkt. No. 13) is **DENIED**; and it is further

**ORDERED**, that the Commissioner's motion for judgment on the pleadings (Dkt. No. 16) is **GRANTED**; and it is further

**ORDERED**, that the final decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 29, 2023
            Albany, New York

LAWRENCE E. KAHN
United States District Judge